UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

MAXUM INDEMNITY COMPANY,

        Plaintiff,

v.                                    CASE NO. 2:10-cv-00428

WESTFIELD INSURANCE COMPANY, and
BRICKSTREET MUTUAL INSURANCE COMPANY,

        Defendants.

MEMORANDUM OPINION AND ORDER

        Pending are Brickstreet Mutual Insurance Company's

motion to dismiss, filed April 30, 2010, and the parties' cross

motions for summary judgment, each filed October 25, 2010.[1]

I.

        This action arises from the death of Richard Patrick,

_____

        [1] Plaintiff filed three separate motions for summary
judgment, each purporting to address a different issue, along
with supporting memoranda collectively totaling fifty-one pages.
Plaintiff may well have intended to present what it believed to
be segregable issues in an efficient manner rather than to
circumvent the page limitation set forth in Local Rule of Civil
Procedure 7.1(a).  Nevertheless, plaintiff's motions are at least
partially duplicative and have resulted in unnecessary
proliferation of filings and needless extra work for both
defendants and the court.  Inasmuch as the motions pertain to the
same overarching issue, namely, whether plaintiff is entitled to
summary judgment on its claim for declaratory relief and
equitable contribution, plaintiff should have presented a single
motion and, absent relief by court order, abided by Rule 7.1(a)'s
page limitation.

who was accidentally killed on March 16, 2009, while working for
a general contractor at a construction project in Charleston,
West Virginia.  Following his death, Patrick's estate threatened
to file a tort action against, among others, the general
contractor and a subcontractor involved in the construction
project.  Maxum Indemnity Company ("Maxum"), which had issued a
commercial general liability insurance policy to the
subcontractor, settled with the decedent's estate, securing a
full release of all claims arising from the incident, including
any claims against the general contractor.  Maxum now seeks an
order declaring that the subcontractor owed no duty to indemnify
the general contractor for claims arising from the incident.
Maxum further seeks equitable contribution from the general
contractor's insurers, defendants Westfield Insurance Company
("Westfield") and Brickstreet Mutual Insurance Company
("Brickstreet").  In the factual discussion that follows, the
court will examine (1) the relevant contract and insurance policy
provisions, (2) the accident causing Patrick's death, and (3)
Maxum's settlement with Patrick's estate.[2]

---

[2] The facts spelled out herein are drawn in large part from
the parties' Stipulation of Facts and Controlling Legal Issues,
filed on September 23, 2010.

A.   The Relevant Contract and Insurance Policy Provisions

        In July 2007, KM Associates, LLC ("KM Associates"), the
owner and manager of the Shops at Kanawha, a shopping center in
Charleston, entered into a Construction Management Services
Agreement with CTC Enterprise Ventures Corporation ("CTC
Enterprise").  (Stipulation of Facts ¶ 4).  Pursuant to the
agreement, CTC Enterprise was to serve as construction manager
for a major renovation project at the shopping center, overseeing
the project's design, bidding, and construction phases.
(Construction Management Services Agreement at 1-2, attached as
Ex. 4 to Compl.).  On December 30, 2008, KM Associates awarded
the general construction contract to Agsten Construction Company,
Inc. ("Agsten").  (Stipulation of Facts ¶ 5).  Agsten held a
commercial general liability policy issued by defendant
Westfield, an insurance company with its principal place of
business in Ohio, and a workers' compensation and employers'
liability policy issued by defendant Brickstreet, an insurance
company with its principal place of business in West Virginia.
(Id. ¶ 3).

        On March 3, 2009, Agsten entered into a subcontract
(the "Subcontract") with Kanawha Valley Construction and Erection

3

Company ("Kanawha Valley"), pursuant to which Kanawha Valley
agreed to furnish supervision, labor, and equipment for erecting
all structural steel at the construction project.  (Subcontract
at 3, attached as Ex. 6 to Compl.).  The Subcontract required,
<u>inter alia</u>, that Kanawha Valley indemnify and hold harmless KM
Associates, CTC Enterprise, and Agsten from and against all
claims arising from Kanawha Valley's performance of the
subcontract. (<u>Id.</u> § 4.6.1).  Specifically, the Subcontract's
indemnification clause provided pertinently as follows:

> To the fullest extent permitted by law, the
> Subcontractor shall indemnify and hold harmless the
> Owner, Contractor, Architect, Architect's consultants,
> and agents and employees of any of them from and
> against claims, damages, losses and expenses, including
> but not limited to attorney's fees, arising out of or
> resulting from performance of the Subcontractor's Work
> under this Subcontract, provided that any such claim,
> damage, loss or expense is attributable to bodily
> injury, sickness, disease or death, or to injury to or
> destruction of tangible property . . ., but only to the
> extent caused by the negligent acts or omissions of the
> Subcontractor, the Subcontractor's Sub-subcontractors,
> anyone directly or indirectly employed by them or
> anyone for whose acts they may be liable, regardless of
> whether or not such claim, damage, loss or expense is
> caused in part by a party indemnified hereunder.

(<u>Id.</u>).  The Subcontract also required Kanawha Valley to purchase
and maintain a commercial general liability insurance policy,
with KM Associates, CTC Enterprise, and Agsten named as
"additional insureds" for claims "caused in whole or in part by
[Kanawha Valley's] negligent acts or omissions during [Kanawha

4

Valley's] operations."  (Id. ¶¶ 13.1, 13.4).

Consistent with its obligations under the Subcontract, Kanawha Valley obtained a commercial general liability insurance policy from Maxum (the "Maxum Policy" or "Policy"), an insurance company with its principal place of business in Georgia. (Stipulation of Facts ¶ 1).  The Maxum Policy, which contained a $1 million per-occurrence limit and $5 million in aggregate coverage, provided that Maxum "will pay those sums that the Insured becomes legally obligated to pay as 'damages' because of 'bodily injury' or 'property damage' to which this insurance applies."  (Maxum Policy at 1).  The Policy defines the "Insured" as Kanawha Valley, its executive officers and directors, and its stockholders.  It further states in an amendment that an "additional insured" is

> [a]ny person or organization for whom you [Kanawha Valley] are performing operations when you and such person or organization have agreed in writing in a contract or agreement prior to the date of loss that such person or organization be added as an additional insured on your policy.

(Compl. Ex. 1 at 40).

The Maxum Policy excludes from coverage "'[b]odily injury' or 'property damage' for which the Insured is obligated to pay 'damages' by reason of the assumption of liability in a

5

contract or agreement." (Maxum Policy at 1). The Policy then excepts from this exclusion "liability for 'damages' . . . [a]ssumed in a contract or agreement that is an 'insured contract.'" (Id.). It defines an "insured contract" as, among other things,

> [t]hat part of any other contract or agreement
> pertaining to your [Kanawha Valley's] business . . .
> under which you assume the tort liability of another
> party to pay for "bodily injury" or "property damage"
> to a third person or organization. Tort liability
> means a liability that would be imposed by law in the
> absence of any contract or agreement.

(Id. at 15).

B. The Accident

On March 16, 2009, Richard Patrick, an Agsten employee, was working at the Shops of Kanawha construction site when he was fatally injured. (Stipulation of Facts ¶ 16). The U.S. Department of Labor's Occupation Safety and Health Administration ("OSHA"), which conducted a subsequent investigation, described the incident as follows:

> [Patrick] was drilling anchor bolt holes for new metal
> clip welded to the column. [Kanawha Valley] was
> installing metal bar joist adjacent to the column. A
> rough terrain forklift equipped with jib was used to
> lift the bar joist. While the fourth bar joist was
> being erected the 1 inch wide 8 foot long synthetic web
> sling was cut into by the top flange of the bar joist
> allowing the end of the 530 pound bar joist to fall
> striking [Patrick] on the head.

(OSHA Inspection Report at 4, attached as Ex. 7 to Compl.).  On
April 28, 2009, OSHA issued a Citation and Notification of
Penalty to Agsten, finding that Agsten had committed a number of
"serious" violations of OSHA's Safety and Health Regulations for
Construction.  For example, OSHA found that Agsten "did not
instruct [Patrick] to stay clear of loads being lifted while
working in near proximity to the erection of steel members."
(Citation & Notification of Penalty at 7, attached as Ex. 8 to
Compl.).  Agsten subsequently entered into an Informal Settlement
Agreement with OSHA, agreeing to pay a $1,875 penalty for its
violations.  (Settlement Agreement at 2, attached as Ex. 10 to
Compl.).  OSHA also issued a Citation and Notice of Penalty to
Kanawha Valley, finding that it likewise violated the safety
regulations governing construction sites.  (Stipulation of Facts
¶ 19).

C.  Maxum's Settlement and Suit for Declaratory Judgment

        By letter dated August 28, 2009, counsel for the estate
of Richard Patrick formally advised KM Associates, CTC
Enterprise, Agsten, and Kanawha Valley that the estate intended
to assert a tort action against these entities for their roles in
the accident.  (Letter from Estate at 2, attached as Ex. 12 to
Compl.).  Attached to the letter was a copy of the estate's draft

7

complaint (the "Draft Complaint"), which asserted four counts
against the various entities.  Count I of the Draft Complaint
alleged that Kanawha Valley, <u>inter</u> <u>alia</u>, negligently exposed
Patrick to the falling bar joist and negligently failed to remove
the defective web sling from service.  (<u>Id.</u> at 7-8).  In Count II
of the Draft Complaint, the estate asserted a so-called
"deliberate intent" claim against Agsten under West Virginia Code
§ 23-4-2(d)(2)(ii).  (<u>Id.</u> at 8-9).  Specifically, the estate
alleged that Agsten "intentionally directed and/or required
[Patrick] to drill anchor bolts in an area where steel bar joists
in excess of 500 pounds were being lifted overhead[,] thereby
creating an unsafe working condition."  (<u>Id.</u> at 8).  The estate
further alleged in Count II of the Draft Complaint that such
working conditions violated state and federal safety regulations
and that Agsten, despite having "a subjective realization and
appreciation" of the risks, intentionally exposed Patrick to the
unsafe working conditions.  (<u>Id.</u>).  Count III of the Draft
Complaint alleged negligence on behalf of KM Associates and CTC
Enterprise, while Count IV sought punitive damages against
Kanawha Valley and Agsten.  (<u>Id.</u> at 9-10).

          In October 2009, KM Associates, CTC Enterprise, and
Agsten tendered their defense and indemnification to Kanawha

Valley's insurer, Maxum.  (Stipulation of Facts ¶ 29).  By letter
dated October 27, 2009, Kanawha Valley requested that Maxum
settle all claims arising from Patrick's death.  (Kanawha Valley
Settlement Letter at 3-4, attached as Ex. 16 to Compl.).
According to Kanawha Valley, the indemnification clause in the
Subcontract clearly required that Kanawha Valley indemnify KM
Associates, CTC Enterprise, and Agsten.  (Id. at 3).  And,
because the Subcontract was an "insured contract," Kanawha
Valley's duty to indemnify Agsten was, according to Kanawha
Valley, covered under the Maxum Policy.  (Id.).  Finally, Kanawha
Valley maintained that coverage was also available to KM
Associates, CTC Enterprise, and Agsten as "additional insureds"
under the Policy.  (Id.).

        On January 7, 2010, Maxum entered into a Release and
Settlement Agreement with Patrick's estate, paying $750,000 to
fully settle all claims arising from the construction accident.
(Release & Settlement Agreement at 2, attached as Ex. 20 to
Compl.).  Patrick's estate agreed to release and discharge
Kanawha Valley, KM Associates, CTC Enterprise, and Agsten, as
well as each entity's employees and agents, from all claims
arising from Patrick's death.  (Id.).  The settlement agreement
did not resolve the relative fault of the four entities, nor did

it determine whether Kanawha Valley was obligated to indemnify the others or whether Maxum was entitled to contribution.

On April 1, 2010, Maxum instituted this action against Westfield and Brickstreet, seeking declaratory relief and equitable contribution.  Specifically, Maxum seeks a declaration that (1) the Subcontract between Agsten and Kanawha Valley does not require that Kanawha Valley indemnify Agsten, and (2) the Maxum Policy does not provide coverage for the claims asserted against Agsten.  With respect to its claim for equitable contribution, Maxum claims that, inasmuch as Kanawha Valley was not required to indemnify Agsten, and inasmuch further as Agsten was not otherwise covered under the Policy, Agsten's insurers, defendants Westfield and Brickstreet, must reimburse Maxum for their share of the sums Maxum paid in settlement of the underlying tort action.  As mentioned, each of the parties now moves for summary judgment.[3]

### II.

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and

---

[3] Inasmuch as the parties are completely diverse and the amount in controversy exceeds $75,000, the court possesses diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(c). Material facts are those
necessary to establish the elements of a party's cause of action.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In assessing a motion for summary judgment, a court
must neither resolve disputed facts nor weigh the evidence,
Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995),
nor may it make determinations of credibility. Sosebee v.
Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party
opposing the motion is entitled to have his or her version of the
facts accepted as true and, moreover, to have all internal
conflicts resolved in his or her favor. Charbonnages de France
v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are
"drawn from the underlying facts . . . must be viewed in the
light most favorable to the party opposing the motion." United
States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Regarding contract cases specifically, our court of
appeals has observed the matter of "interpretation is a subject
particularly suited for summary judgment." Bank of Montreal v.
Signet Bank, 193 F.3d 818, 835 (4th Cir. 1999). If "the contract
is unambiguous on the dispositive issue," or if extrinsic

11

evidence definitively resolves the interpretative issue concerning an ambiguous contract, summary judgment is appropriate.  <u>Goodman v. Resolution Trust Corp.</u>, 7 F.3d 1123, 1126 (4th Cir. 1993).  However, "an ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of material fact," rendering summary judgment "inappropriate."  <u>Sempione v. Provident Bank</u>, 75 F.3d 951, 959 (4th Cir. 1996).

### III.

A.    Whether the Subcontract Required Indemnification

The parties' primary dispute in this matter concerns the scope of the Subcontract's indemnification provision. Specifically, the parties disagree over whether that provision required Kanawha Valley to indemnify Agsten for the "deliberate intent" claim asserted by Patrick's estate pursuant to West Virginia Code § 23-4-2(d)(2)(ii).  <u>See</u> <u>infra</u> note 5 (discussing the two types of deliberate intent claims).  Defendants Westfield and Brickstreet contend that the Subcontract's plain and unambiguous language required indemnification for all claims arising from the construction incident, whereas Maxum maintains that the Subcontract's indemnification clause encompasses only

12

those claims arising from Agsten's negligent conduct.

In resolving this dispute, the court must first assess the Subcontract's terms and, if clear and unambiguous, apply them as intended by the parties.  See Benson v. AJR, Inc., 698 S.E.2d 638, 648 (W. Va. 2010).  As mentioned, the indemnification clause provides pertinently as follows:

> To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses . . . arising out of or resulting from performance of the Subcontractor's Work under this Subcontract, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property . . ., but only to the extent caused by the negligent acts or omissions of the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.

(Subcontract § 4.6.1).  Stated more succinctly and as relevant to this matter, the provision mandates that Kanawha Valley indemnify Agsten from any claim arising out of bodily injury or death caused, in whole or in part, by Kanawha Valley's negligent acts or omissions in performing the Subcontract, whether or not Agsten was also partially responsible for the claim.

The indemnification provision's language is plain and

13

unambiguous, and applying that provision in this case demonstrates that Kanawha Valley was required to indemnify Agsten from the kind of deliberate intent claim asserted by Patrick's estate. Neither party disputes that Patrick's death resulted in part from Kanawha Valley's negligence in employing a defective sling at the construction project. Inasmuch as Kanawha Valley's negligent acts partially caused Patrick's death, the Subcontract required Kanawha Valley to indemnify Agsten from any claims resulting therefrom. Whether or not Agsten also contributed to Patrick's death, through its negligent conduct or otherwise, is simply irrelevant. The lone condition precedent to Kanawha Valley's indemnification obligation was that a claim arise from bodily injury or death resulting from Kanawha Valley's negligence. Inasmuch as that condition was satisfied here, Kanawha Valley squarely owed an obligation to indemnify Agsten.

Notwithstanding this plain language, Maxum asserts that Kanawha Valley owed no duty to indemnify Agsten for the "deliberate intent" claim. Maxum raises two contentions to support its reading of the Subcontract. First, it contends that Kanawha Valley was not required to indemnify Agsten because the Subcontract did not "clearly and definitely show an intention to indemnify against" claims alleging more than mere negligence. In

other words, inasmuch as the Subcontract did not specify that Kanawha Valley owed a duty to indemnify Agsten for claims of "deliberate intent," Maxum asserts that Kanawha Valley owed no such duty.  To support its contention in this regard, Maxum emphasizes the long-standing rule in West Virginia that a contract attempting "to relieve a party from liability for his own negligence . . . must be clear and definite."  <u>Bowlby-Harman Lumber Co. v. Commodore Servs.</u>, 144 W. Va. 239, 107 S.E.2d 602, 607 (1959).  From this rule, Maxum concludes that "logically the requirements for indemnification of a party for his acts of 'deliberate intent' must certainly be heightened."  (Mem. Supp. Maxum's Mot. Summ. J. at 13).

Maxum's contention is unpersuasive.  To begin with, Maxum's reliance on the "clear and definite" rule announced in <u>Bowlby-Harman</u> is misplaced.  As subsequently explained by the Supreme Court of Appeals of West Virginia, the requirement that indemnity agreements contain clear and definite language resulted from so-called "sole negligence" indemnity agreements, pursuant to which an indemnitor is obliged to indemnify an indemnitee, even if the indemnitee was one hundred percent at fault for the underlying claim.  See <u>Dalton v. Childress Serv. Corp.</u>, 189 W. Va. 428, 432 S.E.2d 98, 101 (1993).  The "clear and definite"

rule alleviates the risk of the indemnitor not securing an appropriate insurance fund by putting the indemnitor on notice that it is responsible for the indemnitee's sole negligence, thereby encouraging the indemnitor to secure adequate insurance. Id.  As mentioned, Kanawha Valley's duty to indemnify was triggered only if Kanawha Valley was at least partially responsible for the underlying claim.  The Subcontract thus does not attempt to indemnify Agsten for its sole negligence, rendering the "clear and definite" standard inapplicable here.[4]

Maxum next contends that, regardless of the Subcontract's language, it would contravene public policy to require Kanawha Valley to indemnify Agsten for acts of "deliberate intent" under West Virginia Code § 23-4-2(d)(2)(ii). (Mem. Supp. Maxum's Mot. Summ. J. at 15).  Maxum correctly asserts that there is no "West Virginia case directly on point as to the right of indemnification for willful acts" and instead

---

[4] Even assuming the "clear and definite" standard applies here, the Subcontract plainly alerted Kanawha Valley that it was obliged to indemnify Agsten for any claim arising in part from Kanawha Valley's negligent conduct, whether or not Agsten was also responsible.  See Marlin v. Wetzel Cnty. Bd. of Ed., 212 W. Va. 215, 569 S.E.2d 462 (2002) (concluding that an identical indmenity provision "clearly shifted legal responsibility for some measure of the plaintiff-workers' alleged tort liability").  Kanawha Valley was thus expected to (and did) secure adequate insurance to cover such claims.

cites decisions from other jurisdictions for the proposition that
"the majority of courts nationally do not permit indemnification
for intentional or wanton misconduct."  (Id. at 17).  Two
principles of West Virginia law, however, lead this court to
predict with confidence that requiring a party to indemnify for a
deliberate intent claim of the variety asserted in the Draft
Complaint does not offend West Virginia public policy.[5]

     First, West Virginia law does not prohibit
indemnification for fraudulent, reckless, or wanton misconduct.
In Marlin v. Wetzel County Board of Education, 212 W. Va. 215,
569 S.E.2d 462 (2002), the Supreme Court of Appeals faced facts
materially indistinguishable from the instant matter and

_____

     [5] The court notes that West Virginia Code § 23-4-2(d)
provides "two separate and distinct methods of proving
'deliberate intention.'"  Mayles v. Shoney's, Inc., 185 W. Va.
88, 92, 405 S.E.2d 15, 19 (1990).  First, an employee may
establish a deliberate intent claim by proving that his employer
"acted with a consciously, subjectively and deliberately formed
intention to produce the specific result or injury or death to an
employee."  W. Va. Code § 23-4-2(d)(2)(i).  Alternatively, the
employee may show deliberate intent by establishing, inter alia,
that the employer intentionally exposed the employee to a
specific unsafe working condition, despite the employer's actual
knowledge of the existence of the unsafe working condition and
the high degree of risk and the strong probability of serious
injury presented thereby.  Id. § 23-4-2(d)(2)(ii).  Inasmuch as
Patrick's estate asserted the latter type of deliberate intent
claim, the court need not address and expresses no judgment as to
whether West Virginia public policy prohibits indemnifying a
party for damages resulting from the first type of deliberate
intent claim.

17

concluded that a contract mandated indemnification.  In that case, the Wetzel County Board of Education (the "Board") had entered into a construction contract with a general contractor to renovate a local high school.  Id. at 465.  The contract between the Board and the contractor included an indemnification provision requiring the contractor to indemnify and hold harmless the Board from all claims arising from the contractor's performance of the contract.  Id.  During the ensuing renovations, several of the contractor's employees were exposed to asbestos dust.  Id. at 466.  Three years later, when the workers learned they had been exposed, they filed suit against the Board and the contractor, asserting that both were negligent in failing to warn the workers of the asbestos.  Id.  The workers also alleged that the defendants had "fraudulently, deceitfully and willfully, wantonly and recklessly concealed from the workers the fact that they were being exposed to unsafe levels of asbestos."  Id.  Relying on its contract with the contractor, the Board demanded indemnification and, after the contractor's insurer refused to provide coverage, filed a complaint for declaratory relief.

In resolving the dispute, the court first explained that indemnification clauses are encouraged in West Virginia,

18

inasmuch as such agreements

> serve our goals of encouraging compromise and
> settlement by reducing settlement discussions to
> bilateral discussions, by encouraging adequate levels
> of insurance, and by allowing the parties to a contract
> to allocate among themselves the burden of defending
> claims.

Id. at 468 (internal quotation marks omitted).  The court then
reviewed the indemnification clause and concluded that the
provision "clearly shifted legal responsibility for some measure
of the plaintiff-workers' alleged tort liability from the Board
to [the contractor.]"  Id. at 469.  The court reached this
conclusion notwithstanding the fact that the plaintiffs had
asserted claims alleging more than mere negligence.  Indeed, the
plaintiff-workers in that case alleged that the Board had
fraudulently and recklessly concealed the fact that they had been
exposed, conduct at least as culpable as that giving rise to the
type of deliberate intent claim asserted by Patrick's estate
against Agsten.  The court's decision in Wetzel thus severely
undermines Maxum's contention that public policy precludes
indemnification in this case.

         It is also noteworthy that West Virginia law does not
prohibit an employer from insuring against the risk of liability
arising under West Virginia Code § 23-4-2(d)(2)(ii).  In Erie
Insurance Property and Casualty Co. v. Stage Show Pizza, JTS,

Inc., 210 W. Va. 63, 553 S.E.2d 257 (2001), the Supreme Court of
Appeals examined a particular "employers' liability" insurance
policy purchased by an employer and concluded that the policy
provided coverage for a § 23-4-2(d)(2)(ii) deliberate intent
claim asserted against the employer by one of its employees.
Inasmuch as insurance is simply "a contract whereby one
undertakes to indemnify another or to pay a specified amount upon
determinable contingencies," W. Va. Code § 33-1-1, the court's
holding in Stage Show Pizza suggests that West Virginia public
policy does not preclude indemnification for damages arising from
a § 23-4-2(d)(2)(ii) deliberate intent claim.

         In short, the Subcontract's plain terms required
Kanawha Valley to indemnify Agsten.  Moreover, recent precedent
of the Supreme Court of Appeals suggests that West Virginia
public policy permits indemnification for a deliberate intent
claim such as the one asserted by Patrick's estate.  Accordingly,
this court concludes that Kanawha Valley was obliged to indemnify
Agsten for any damages arising from the construction accident.

B.   Whether Maxum is Entitled to Reimbursement from Westfield
     and Brickstreet Under the Doctrine of Equitable Contribution

         Notwithstanding the indemnity provision, Maxum contends
that it is entitled to reimbursement from Westfield and

                              20

Brickstreet pursuant to the doctrine of equitable contribution.
Maxum maintains that it acted in the best interest of its
insured, Kanawha Valley, when it settled with Patrick's estate.
To disallow reimbursement would, according to Maxum, "reward an
insurance company who tried to dodge paying to settle claims on
behalf of its insured and punish a company who tried to do the
right thing."  (Maxum's Reply Br. at 5).

Equitable contribution is the right to recover from a
co-obligor who shares liability for a loss with the party seeking
contribution.  See Exec. Risk Indem., Inc. v. Charleston Area
Med. Ctr., Inc., 681 F. Supp. 2d 694, 708 (S.D. W. Va. 2009).
With respect to insurance, the right to contribution arises when
several insurers are obligated to indemnify or defend the same
loss or claim, and one insurer has paid more than its share of
the loss or defended action without any participation by the
others.  Id.  Equitable contribution permits reimbursement to the
insurer that paid more than its share on the theory that the debt
it paid was equally and concurrently owed by the other insurers.
Id.

Maxum is not entitled to equitable contribution for the
simple reason that the settlement funds it paid were not equally
and concurrently owed by Westfield or Brickstreet.  Kanawha

Valley, in consideration for being awarded the Subcontract, expressly agreed to indemnify Agsten for any claim or loss resulting from Kanawha Valley's negligence in performing the Subcontract.  Indeed, absent Kanawha Valley's negligence, there would have been no accident and no claim or loss.  Under the Subcontract then, Agsten was not accountable for any loss or injury occurring during construction activities undertaken by Kanawha Valley.  Just as Kanawha Valley has no right of recovery against Agsten, Kanawha Valley's insurer, Maxum, has no right to recover from Agsten's insurers, Westfield and Brickstreet.  To conclude otherwise would effectively negate the indemnity agreement and impose liability on Westfield and Brickstreet when their insured bargained to avoid that very result.  Maxum calculated and accepted premiums from Kanawha Valley with full knowledge that, pursuant to the "insured contract" provision of the Maxum Policy, it might be called upon to satisfy a full judgment against Kanawha Valley and Agsten.  Maxum cannot now rely on equitable principles to avoid an obligation plainly called for by both the Subcontract and the Maxum Policy.[6]

---

[6] Although the West Virginia courts have not yet addressed the interplay between an indemnification agreement and the doctrine of equitable contribution, "most, if not all, jurisdictions to have faced the question of whether an indemnification agreement could relieve particular insurers of an obligation to pay . . . have answered in the affirmative."  St.

22

IV.

Pursuant to the foregoing analysis, it is ORDERED as follows:

1.   That Westfield's motion for summary judgment be, and it hereby is, granted;

2.   That Brickstreet's motion for summary judgment be, and it hereby is, granted;

3.   That Brickstreet's motion to dismiss be, and it hereby is, denied as moot;

4.   That each of Maxum's motions for summary judgment be, and they hereby are, denied; and

5.   That this case be dismissed and stricken from the docket of the court.

---

Paul Fire Ins. v. Am. Intern. Spec. Lines, 365 F.3d 263, 272 (4th Cir. 2004); see also Am. Indem. Lloyds v. Travelers Prop., 335 F.3d 429, 436 (5th Cir. 2003) ("[T]he clear majority of jurisdictions . . . gives controlling effect to the indemnity obligation of one insured to the other insured over 'other insurance' or similar clauses in the policies of the insurers, particularly where one of the policies covers the indemnity obligation."); 15 Couch on Insurance § 218:19, p. 218-25 (3d ed. 1999) ("In a variety of commercial relationships, such as . . . contractor-subcontractor, the contracts between the parties contain indemnification agreements in which one agrees to hold the other harmless for its own acts of negligence or that of its employees.  Such contractual arrangements can nullify a right to contribution.").

        The Clerk is directed to forward copies of this written
opinion and order to all counsel of record and any unrepresented
parties.

                        DATED: January 25, 2011


                        _____
                        John T. Copenhaver, Jr.
                        United States District Judge